## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN RANSOM, Derivatively on Behalf of Nominal Defendant WW INTERNATIONAL, INC., <br><br>        Plaintiff, <br><br>   v. <br><br> MINDY GROSSMAN, RAYMOND DEBBANE, STEVEN M. ALTSCHULER, JONAS M. FAJGENBAUM, DENIS F. KELLY, JULIE RICE, THILO SEMMELBAUER, CHRISTOPHER J. SOBECKI, OPRAH WINFREY, PHILIPPE J. AMOUYAL, CYNTHIA ELKINS, SACHA LAINOVIC, and NICHOLAS P. HOTCHKIN, <br><br>        Defendants, <br><br>   and <br><br> WW INTERNATIONAL, INC., f/k/a WEIGHT WATCHERS INTERNATIONAL, INC., <br><br>        Nominal Defendant. | Case No. 1:19-cv-9878 <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Jonathan Ransom ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, WW International, Inc. f/k/a Weight Watchers International, Inc. ("Weight Watchers" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, gross mismanagement, violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and insider trading (*i.e. Brophy* claim). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation

and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Weight Watchers with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.     Weight Watchers employs a science-driven approach to help customers lose weight by forming healthy eating habits and getting more exercise.  Its subscriptions for digital products and for workshops are offered as commitment plans, prepayment plans, and "pay-as-you-go" arrangements.   The Company also earns revenue by selling consumer products, collecting commissions from franchisees, and selling advertising space.  Subscription fees account for more than 80% of the Company's revenue.

2.     Since February 2018, the Company issued quarterly financial results that touted strong subscriber growth and retention.  The Company also expected to have five million subscribers by the end of fiscal 2020 who would drive revenues in excess of $2 billion.

3.     However, these statements were misleading because they failed to disclose that: (i) recruiting lapsed members was necessary to grow the Company's profits and membership; (ii) the Company would focus on attracting new customers, rather than retaining lapsed members; (iii) the Company would not launch a new program innovation in December, deviating from its historical practice; (iv) the Company was unlikely to retain four million subscribers at year-end 2018 as a result of the weak subscriber trends and typical fourth quarter subscription lapses; (v) as a result, the Company was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020; and (vi) that, due to lower subscriber count, the Company would experience lower revenues and profits.

4.      On November 1, 2018, the Company revealed that end-of-period subscriber count declined by 300,000 quarter-over-quarter to 4.2 million.

5.      On this news, the Company's stock price fell $20.36, or nearly 30%, to close at $48.13 per share on November 2, 2018, on unusually heavy trading volume.

6.      On February 26, 2019, the Company disclosed that subscriber count had further declined to 3.9 million and that enrollment would continue to decline in fiscal 2019.  The Company only expected $1.4 billion revenue for fiscal 2019, below investors' expectations of $1.7 billion revenue and well below the previous projections for $2 billion annual revenue by end-of-2020.

7.      On this news, the Company's share price fell $10.20, or nearly 35%, to close at $19.37 per share on February 27, 2019, on unusually high trading volume.

8.      These revelations precipitated the filing of a securities class action in this District against Weight Watchers and certain of defendants, *In re Weight Watchers International, Inc. Securities Litigation*, Case No. 1:19-cv-02005-WHP (the "Securities Class Action").

9.      On July 18, 2019, Plaintiff sent a litigation demand to the Board, demanding that the Board "investigate whether any of Weight Watchers' officers and directors committed non-exculpable breaches of fiduciary duties or other violations of applicable law."  A true and correct copy of this Demand is attached hereto as Exhibit A.

10.     Under Virginia law, the Board had 90 days to respond to the Demand.  The Board's failure to do so despite the Company's increasing risk of liability in the Securities Class Action is not a valid exercise of business judgment.

11.     For these reasons and as set forth in greater detail herein, including the Board's unreasonable delay in investigating these matters, Plaintiff now files this action against the

Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by Weight Watchers and its shareholders.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

14.     Plaintiff Jonathan Ransom purchased Weight Watchers stock in 2017 and has continuously owned his Weight Watchers stock since that date.

**Nominal Defendant**

15.     Nominal Defendant Weight Watchers is a Virginia corporation with its principal executive offices located at 675 Avenue of the Americas, 6th Floor, New York, New York 10010. The Company stock trades on the NASDAQ exchange under the symbol "WW."

**Defendants**

16.     Defendant Mindy Grossman ("Grossman") has served as Chief Executive Officer, President, and director of the Company since July 2017.

17.     Defendant Raymond Debbane ("Debbane") has served as Chairman of the Board of Directors since 1999.  Debbane is the Chief Executive Officer and a director of Artal Group S.A. ("Artal"), which controls Weight Watchers.  Debbane is the co-founder, President, and Chief Executive Officer of The Invus Group, LLC ("Invus"), which is the exclusive investment advisor to Artal.   Debbane is also managing director of Artal's subsidiaries, Artal International Management and Artal Luxembourg S.A.

18.     Defendant Steven M. Altschuler ("Altschuler") has served as a director of the Company since September 2012.  Altschuler is a member of the Audit Committee.

19.     Defendant Jonas M. Fajgenbaum ("Fajgenbaum") has served as a director of the Company since 1999.  Fajgenbaum serves as managing director of Invus.

20.     Defendant Denis F. Kelly ("Kelly") has served as a director of the Company since May 2015.  Kelly is Chairman of the Audit Committee.

21.     Defendant Julie Rice ("Rice") has served as a director of the Company since August 2018.

22.     Defendant Thilo Semmelbauer ("Semmelbauer") has served as a director of the Company since September 2016.

23.     Defendant Christopher J. Sobecki ("Sobecki") has served as director of the Company since 1999.  Sobecki serves as managing director of Invus.

24.     Defendant Oprah Winfrey ("Winfrey") has served as director of the Company since October 2015.

25.     Defendant Philippe J. Amouyal ("Amouyal) served as a director of the Company from November 2002 to February 26, 2019.  Amouyal is managing director of Invus.

26.     Defendant Cynthia Elkins ("Elkins") served as a director of the Company from March 2014 to February 26, 2019.

27.     Defendant Sacha Lainovic ("Lainovic") served as a director of the Company from 1999 to August 9, 2018.  Lainovic was a partner of Invus until 2006 when he co-founded Invus Financial Advisors, LLC.

28.     Defendant Nicholas P. Hotchkin ("Hotchkin") has served as Chief Financial Officer of the Company since August 2012.

29.     The defendants named in ¶¶16-28 are sometimes referred to hereinafter as the "Individual Defendants."  The defendants named in ¶¶16-27 are sometimes referred to hereinafter as the "Director Defendants."

**Relevant Non-Parties**

30.     Julie Bornstein ("Bornstein") has served as a director of the Company since February 2019.

31.     Tracey D. Brown ("Brown") has served as a director of the Company since February 2019. Brown is a member of the Audit Committee.

32.     Artal is the controlling shareholder of Weight Watchers.  Artal acquired Weight Watchers when it was spun-off by H.J. Heinz Company ("Heinz") in 1999 with a $224 million deposit and debt issuances.  As of March 12, 2018, Artal owned more than 29.4 million shares of Weight Watchers common stock, or 44.47% of its then-outstanding shares.  Via its contractual relationships with Defendant Winfrey, who then owned 11% of Weight Watchers common stock, Artal exercised effective control of Weight Watchers throughout the Relevant Period.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers, directors, and/or fiduciaries of Weight Watchers and because of their ability to control the business and corporate affairs of Weight

Watchers, at all relevant times, the Individual Defendants owed Weight Watchers and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Weight Watchers in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Weight Watchers and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Weight Watchers and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Weight Watchers, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Weight Watchers, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

35.     To discharge their duties, the officers and directors of Weight Watchers were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Weight Watchers were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

**Background**

36.     Weight Watchers employs a science-driven approach to help customers lose weight by forming healthy eating habits and getting more exercise.  Its subscriptions for digital products and for workshops are offered as commitment plans, prepayment plans, and "pay-as-you-go" arrangements.  The Company also earns revenue by selling consumer products, collecting commissions from franchisees, and selling advertising space.  Subscription fees account for more than 80% of the Company's revenue.

37.     Historically, Weight Watchers generates subscriber growth by: (i) retaining current members; (ii) recruiting lapsed members; and (iii) attracting new members who do not have prior subscriptions.  Subscriber growth is substantially generated by recruiting lapsed members.

38.     Weight Watchers typically experiences a seasonal increase in subscriptions during the year-end holidays when people typically set fitness and weight loss goals.  Accordingly, the Company would market "program innovations" (such as an improved diet plan, a new counseling program, or other service benefit) in December to attract new customers.  Upon information and belief, it takes one to two years to research, develop, market-test, and ultimately implement such program innovations.

39.     The Company provides tools to help its members achieve their weight loss goals. For example, members can use Weight Watchers' points system, which assigns points to food

based on its calories and fat content, to control their food intake by keeping their daily food intake below a certain number of points.

40.     In December 2017, the Company launched Freestyle, which expanded the number of foods that were allocated zero points.  Previously, only fruits and vegetables were included; Freestyle expanded the list to include over two hundred items, including high-protein foods. Upon information and belief, the Company hoped this would attract younger members beyond its core demographic of middle-aged people.

**The Individual Defendants Cause the Company to Issue Misleading Statements**

41.     On February 7, 2018, the Company announced a strategic vision to achieve record-breaking membership and revenue figures by end-of-2020: Weight Watchers aimed to "[h]elp 10 million people adopt healthy habits, with 5 million people in the Weight Watchers program and an additional 5 million people engaging through other Weight Watchers experiences and content." This would "[i]ncrease revenue to more than $2 billion, driven primarily by new member growth and improved retention."

42.     On February 27, 2018, the Company announced its financial results for the year ended December 31, 2017 in a press release.  It also provided guidance for fiscal 2018, stating it expected revenue approaching $1.55 billion and earnings between $2.40 and $2.70 per fully diluted share.  According to the press release, "[t]his guidance reflects the operating strength of the Company's business and expected continued global momentum through the year."

43.     On February 28, 2018, the Individual Defendants caused the Company to file its annual report on Form 10-K for the period ended December 30, 2017 (the "2017 10-K"), which affirmed the results reported in the press release.  Moreover, the 2017 10-K stated that the Company's revenue consists of: (i) service revenue derived from subscription fees; (ii) product sales; and (iii) licensing, franchise royalties, and other revenue.  For fiscal 2017, 2016, and 2015,

service revenue accounted for 82.8%, 81.5%, and 80.5%, respectively, of the Company's reported revenue.  The 2017 10-K was signed by Defendants Grossman, Hotchkin, Debbane, Altschuler, Amouyal, Elkins, Fajgenbaum, Kelly, Lainovic, Semmelbauer, Sobecki, and Winfrey.

44.    On May 3, 2018, the Company announced its first quarter 2018 financial results in a press release and reported $408 million revenue, or a 24% increase year-over-year.   The Company highlighted that end-of-period subscribers increased "29% year-over-year to a record 4.6 million" and that total paid weeks increased "27% year-over-year."  Defendants Grossman and Hotchkin emphasized the subscriber growth and its continued positive impact on revenue, stating in relevant part:

> "Driven by the enthusiastic, global response to our new WW Freestyle™ program, we ended the first quarter with 4.6 million subscribers – the highest level in the history of Weight Watchers and an increase of 1 million compared to a year ago. Member engagement has been incredible with members staying longer than ever before. Average retention is now well over 9 months," said Mindy Grossman, the Company's President and CEO.

> \* \* \*

> "In the first quarter of 2018, we delivered impressive revenue growth and continued margin expansion, doubling our operating income compared to the prior year quarter," said Nick Hotchkin, the Company's CFO. "Based on our strong performance and continued momentum, we expect our annual revenue to grow by almost 20% and have raised earnings guidance for 2018."

45.    In the same press release, the Company increased its fiscal 2018 earnings guidance to a range between $3.00 and $3.20 per fully diluted share to "reflect[] the operating strength of the Company's business and expected continued global momentum through the year."

46.    The same day, the Company held a conference call to discuss the financial performance with analysts.  During the call, Defendant Grossman emphasized strong ongoing momentum in adding and retaining subscribers, stating in relevant part:

> We ended the quarter with 4.6 million subscribers worldwide, the highest level in the history of Weight Watchers, driven by ***the enthusiastic global response to our***

***new program***. To put that into context, that's an increase of 1 million subscribers from a year ago. Furthermore, ***our average retention is well over nine months, also the highest level in our company history***.

\* \* \*

Our impactful program and marketing message resonated with consumers in all of our major markets, ***driving strong member recruitment throughout Q1. And in fact, our top global signup days in our history occurred in the first two weeks of 2018***.

\* \* \*

In addition to our largest market, North America, ***delivering a third strong winter season in a row, our international markets performed very well with our largest Continental European markets, France and Germany, achieving record member recruits in the quarter.***

\* \* \*

***The themes that drove our performance in Q1 have continued into the spring season*** with integrated marketing campaigns encompassing television, digital, social and leveraging our influencers and ambassadors.

\* \* \*

By presenting Weight Watchers, in new ways and with new voices, ***we are appealing to a broader audience, who may not have considered Weight Watchers as a program for them in the past. Looking at the U.S., as an example, approximately 40% of our member signups in Q1 were new to Weight Watchers, an increase in the proportion of first-time members compared to recent years.*** This strong performance today is a direct result of our execution across all of the elements of our strategic plan: excellent, effective, integrated marketing campaigns and enhanced member experience due to the efficacy and simplicity of our new WW Freestyle program; the enthusiasm and experience of our coaches and ambassadors; and the ongoing enhancements and capabilities found in our mobile app.

\* \* \*

***Our business has never been stronger***, supported by a mobile-first technology platform. And agile development approach . . . the beginnings of a brand-led culture with integrated marketing and a relentless focus on consumer insights, as we expand Our Impact Manifesto to encompass wellness. As we make bold moves to capture the opportunities before us, I am confident in the ***sustainability of our growth***, and excited about the new opportunities we have in front of us.

(Emphasis added.)

47.     During the same call, Defendant Hotchkin also emphasized the strong subscription

and retention momentum, stating in relevant part:

> *Our momentum accelerated in the first quarter of 2018 with strong global recruitment and retention*, driving top line growth and margin expansion. But before I get into the results, for those of you who are newer to our story, the core of our business is our high-margin subscription business model. *Monthly subscriptions account for approximately 80% of our total revenue, and we are able to use marketing very effectively to drive recruitment*.
>
> Using the U.S. as an example, the majority of our members join with a three month or longer commitment and receive a discount for that initial period, followed by monthly renewals at our full rate of $19.95 a month for online or $44.95 a month to also include meetings.
>
> *We have predictable seasonal trends* with approximately 40% of our annual member recruitment and annual marketing expense occurring in the first quarter. As such, Q1 bears the lion's share of the costs of attracting new members that captures only a portion of the associated revenue. *On a global basis, average retention is now well over nine months in both meetings and online, representing more than 15% increase versus three years ago. This reflects improvements in the member experience and increasing engagement with tools like Connect, our social media platform, embedded in our app. We have also seen success in our long-term commitment plan offerings. Looking at the U.S. signups in Q1, 25% chose an initial six-month plan versus only 5% taking the six-month option a year ago*.
>
> Turning to our Q1 performance, year-over-year recruitment growth rates comfortably exceeded levels attained during our last two winter seasons, bringing our end-of-period subscribers to 4.6 million, up 1 million or 29% from prior year, driven by very strong WW online performance. Total paid weeks were up 27% year-over-year in Q1, with double-digit gains in all of our major geographies.

(Emphasis added.)

48.     During the same call, Defendant Hotchkin further stated that the Company was on

track to achieve its end-of-2020 goals of five million subscribers to drive revenues exceeding $2

billion.  He stated, in relevant part:

> With this Q1 performance and *our spring season off to a good start, we are confident that our top line strength will continue for the rest of 2018. We now expect full-year 2018 revenue slightly north of $1.55 billion, almost 20% growth year-over-year driven by continued member recruitment growth, solid retention,*

*as well as the flow through from the higher subscriber base at the start of this year*

Our guidance assumes we will end 2018 with roughly 4 million subscribers, which would be 25% higher than the 3.2 million end-of-period subscribers in 2017, *setting us up for a revenue and profit tailwind heading into 2019*.

\* \* \*

*We're increasing our full-year GAAP EPS guidance to a range of $3 to $3.20*, representing substantial earnings growth compared to 2017, *driven by our continued operating strength.*

\* \* \*

To provide a bit more color on our revenue forecast, in North America, our largest market, *we anticipate full year revenues to be up in the mid-teens.* In Continental Europe, we now expect full year revenue to be up in the mid-20% range. And in the UK, we expect full-year revenue to be up in the mid-teens.

\* \* \*

And finally, looking further ahead, we recently outlined our three-year goal to increase *our revenue to more than $2 billion in 2020 versus $1.3 billion in 2017*. We expect about 80% of this revenue growth to be driven by continued positive recruitment and improvements in retention with opportunities in products, licensing, partnerships, B2B and new geographies also contributing to the overall growth picture.

As seen in our performance, *recruitment growth results in gross margin expansion*. In addition, we are managing the business to keep marketing and G&A expenses as a percent of sales relatively flat. Therefore, *we believe we have future margin expansion upside and we expect our growth rate of profit to exceed our growth rate of sales*.

(Emphasis added.)

49.     On May 4, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 which was signed by Defendants Grossman and Hotchkin.

50.     The above statements were misleading because they failed to disclose that: (i) the recruiting lapsed members was necessary to grow the Company's profits and membership; (ii) the Company would focus on attracting new customers, rather than retaining lapsed members; (iii) the

Company would not launch a new program innovation in December, deviating from its historical practice; (iv) the Company was unlikely to retain four million subscribers at year-end 2018 as a result of the weak subscriber trends and typical fourth quarter subscription lapses; (v) as a result, the Company was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020; and (vi) due to lower subscriber count, the Company would experience lower revenues and profits.

**The Individual Defendants Cause the Company to Issue a Misleading Prospectus**

51.     On May 7, 2018, the Individual Defendants caused the Company to file a Form S-3 shelf registration statement with the SEC to allow Artal to sell shares whenever Artal sought to do so.  The Form S-3 was effective immediately and expressly incorporated by reference, among other things, the 2017 10-K.  The Form S-3 was signed by Defendants Grossman, Hotchkin, Debbane, Altschuler, Amouyal, Elkins, Fajgenbaum, Kelly, Lainovic, Semmelbauer, Sobecki, and Winfrey

52.     On May 14, 2018, the Individual Defendants caused the Company to file a final prospectus with the SEC on Form 424b7 ("Prospectus," and with the Form S-3, the "Registration Statement").  Item 303 of Regulation S-K requires the Registration Statement to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations, especially regarding the company's future prospects.

53.     The Registration Statement stated that Weight Watchers' business plan employed three levers:

> We intend to continue to rapidly grow our business and profitability by continuing to offer compelling value to our members. We are focused on driving growth through the following levers:
>
> - ***increase recruitment of new subscribers*** to expand our member base through a growing influencer community, effective marketing, and agile, brand-led innovations;

- sustained focus on member retention through continued expansion of our social network Connect and enhancements to our products and services to create valuable customer experiences; and

- continue brand-led consumer product innovation to drive licensing and partnership revenue.

(Emphasis added.)

54.     The Registration Statement further stated that "[W]ith only 5% of U.S. adults who are trying to lose weight in a commercial weight management plan, [the Company has] a significant opportunity to drive increased penetration of and engagement with our brand." Moreover, the Prospectus stated that "The Prospectus further stated that "[o]ur strong, widely-recognized and trusted brand allows us to more efficiently *acquire new members and broaden our appeal to new audiences*."

55.     The Registration Statement repeatedly focused on the recruitment of new members and diversifying Weight Watchers' membership:

*Continue to Broaden and Diversify our Influencer Network to Attract Members*

Our influencers increase awareness of Weight Watchers through social media engagement and other outlets and allow us to more efficiently and effectively recruit and retain members. We are continually expanding our scope of influencers to include a diverse range of individuals, from celebrities to member ambassadors, *to promote our brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender.*

* * *

*We seek to expand and strengthen our communities and diversify our reach across ethnicities, geographies, age, lifestage and gender* through our strategic relationships with influencers. Celebrities, health and wellness influencers, brand ambassadors and chief share their experiences with our products and program to *attract new members* and inspire current members.

56.     Regarding demand for the Company's offerings, subscriber growth, and customer retention, the Registration Statement stated, in relevant part:

Our strong brand, together with the effectiveness of our program, loyal customer base, unparalleled network of meetings and leaders and strong digital offerings, ***enable us to attract and retain both new and returning customers.***

\* \* \*

As of March 31, 2018, we had approximately 4.6 million subscribers of our digitally enabled program, including 1.6 million members who also subscribe to our in-person meetings. Through our 360 degree experience, we connect with our members digitally through online content, our social network Connect, 24/7 chat and other social media channels. We also host approximately 30,000 Weight Watchers meetings each week around the world, run by approximately 8,600 leaders, all of whom have deep experience with our program. Our strong brand, together with the effectiveness of our program, loyal customer base, unparalleled network of meetings and leaders and strong digital offerings, ***enable us to attract and retain both new and returning customers.***

\* \* \*

We have an attractive financial profile with significant ***growth and momentum in revenues and subscribers***. We have achieved ***eight consecutive quarters of revenue growth*** on a constant currency year-over-year basis and have ***grown our number of End of Period Subscribers for nine consecutive quarters on a year-over-year basis***.

We achieved ***our longest ever average member length of stay of well over nine months*** in our most recent quarter. Our subscription-based model provides a recurring and reliable revenue stream from meeting fees and Online subscriptions, which together accounted for 83% of our revenues and 86% of our gross profit in the fiscal year ended December 30, 2017. We believe that, with only 5% of U.S. adults who are trying to lose weight using a commercial weight management plan, we have a significant opportunity to drive increased penetration of and engagement with our brand. We further believe our deep knowledge of weight management, international presence and brand awareness uniquely position us for growth in the global wellness and weight management market.

\* \* \*

Our business has significant momentum and we believe that we are in the early stages of realizing the return on our investments, which we expect will result in continued growth and profitability.

57.    Regarding the Company's "Loyal and Growing Customer Base," the Registration

Statement stated, in relevant part:

Over our history, we have created a powerful global network of loyal members, growing our customer base to approximately 4.6 million subscribers as of March

31, 2018.  Furthermore, our network of service providers who have achieved their weight loss goals on our program provides us with a competitive advantage.

*The quality, credibility and compelling consumer value of our offerings engender a deep affinity to Weight Watchers and enable us to attract new and returning customers efficiently. Our meeting members have historically demonstrated consistent loyalty to the brand and a significant percentage have repeatedly resubscribed to the program*.

We have also invested heavily in enhancing our digital offerings, *which has propelled significant growth in our Online business*. Our WW Freestyle program, improvements in our digital platform and services, and effective marketing, including ambassador campaigns, *have driven recruitment growth and improved our average subscriber retention rate. As of the end of our first quarter of fiscal 2018, our member average length of stay increased to well over 9 months, representing a more than 15% increase as compared to three years ago and is the longest average length of stay in our history. Also, as of the end of our first quarter of fiscal 2018, the number of our End of Period Subscribers increased 28.6% on a year-over-year basis, which was our ninth consecutive quarter of End of Period Subscriber growth on a year-over-year basis.*

The chart below sets forth our year-over-year End of Period Subscriber growth for the periods indicated.



58.     Regarding the Company's "Highly Attractive Business Model and Strong Financial Profile," the Registration Statement stated, in relevant part:

We are a global healthy living brand that benefits from a subscription-based model *that generates recurring and reliable revenue*, which allows us to continually make investments to support future growth. The sign-up process encourages new customers to join with a three-month commitment at introductory pricing followed by auto-renewal at our normal rate. Our efficient business model features strong gross margins and a variable cost structure, producing high margins with very low cost to serve incremental subscribers across both our meetings and Online

businesses. Our Online business is asset-light and highly scalable with centralized infrastructure. Our disciplined cost management approach combined with our low capital expenditure requirements has generated significant cash flows.

59.     The statements in the Registration Statement were misleading because they failed to disclose that: (i) the recruiting lapsed members was necessary to grow the Company's profits and membership; (ii) the Company would focus on attracting new customers, rather than retaining lapsed members; (iii) the Company would not launch a new program innovation in December, deviating from its historical practice; (iv) the Company was unlikely to retain four million subscribers at year-end 2018 as a result of the weak subscriber trends and typical fourth quarter subscription lapses; (v) as a result, the Company was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020; and (vi) due to lower subscriber count, the Company would experience lower revenues and profits.

**The Individual Defendants Cause the Company to Continue to Issue Misleading Statements**

60.     On August 6, 2018, the Company announced its second quarter 2018 financial results and reported that $410 million revenue a 20% increase year-over-year.  Moreover, the press release highlighted that end-of-period subscribers increased "28% year-over-year to 4.5 million and total paid weeks increased "27% year-over-year."   Defendants Grossman and Hotchkin emphasized continued subscriber growth and retention success, stating in relevant part:

> "Our WW Freestyle™ program is resonating globally, driving ***continued strong performance in all of our major markets. We ended the second quarter with 4.5 million subscribers*** – an increase of 1 million compared to a year ago – as our momentum continued during our first global, summer marketing campaign," said Mindy Grossman, the Company's President and CEO.
>
> * * *
>
> "***We delivered strong revenue growth and continued margin expansion in the second quarter of 2018, building upon the impressive results we saw earlier in the year***," said Nick Hotchkin, the Company's CFO. "With continued momentum expected in the second half of the year, we have raised our earnings guidance for 2018."

61.     In the same press release, the Company increased its fiscal 2018 earnings guidance to a range between $3.10 and $3.25 per fully diluted share to "reflect[] the operating strength of the Company's business and expected continued global momentum through the year."

62.     The same day, the Company held a conference call to discuss the financial results with analysts.  During the call, defendant Grossman highlighted the ongoing momentum in adding and retaining subscribers, stating in relevant part:

> We had another quarter of strong performance in Q2, **with momentum that continued in the spring and throughout the summer**, following the global launch of Invite a Friend and our first Summer of Impact marketing campaign.
>
> We ended the quarter with 4.5 million subscribers worldwide, an increase of 1 million subscribers from a year ago, **due to continued double-digit member recruitment growth across all of our major geographic markets**.
>
> And importantly, **our average retention continues to be at record levels of well over nine months. These results demonstrate the global appeal of our WW Freestyle program, supported by strong, integrated marketing execution, and a robust and engaging digital platform**.
>
> By presenting WW in new ways, **we're starting to attract a broader and more diverse audience, bringing in many new members who may not have considered Weight Watchers as a program for them in the past**.
>
> **Similar to what we saw in the first quarter, in the U.S., more than 40% of our member signups in Q2 were new to WW, an increase in the proportion of first-time members compared to recent years.**
>
> *      *      *
>
> **2018 is on track to be an important and memorable year for WW. Our business is strong, supported by a mobile-first technology platform and agile development approach, a test and learn mindset, focused on consumer insights and a brand-led culture.**
>
> As we make the next steps to move to a holistic wellness platform, we are modernizing our brand to be more culturally relevant to attract a more diverse audience and to drive continued engagement. **I am confident in our strategies to capture the growth opportunities ahead.**

63.     During the same call, Defendant Hotchkin further stated that the Company was on track to achieve its end-of-2020 goals of five million subscribers to drive revenues exceeding $2 billion.  He stated, in relevant part:

> We are **increasing our full year GAAP EPS guidance to a range of $3.10 to $3.25, representing the continuing strong momentum we are driving across all of our major geographies**.
>
> * * *
>
> To provide a bit more color on our revenue forecasts, in North America, our largest market, **we anticipate full year revenues to be up in the mid-teens.** In Continental Europe, we expect full year revenue to be up in the mid-20% range. And in the U.K., we expect full year revenue to be up in the low double digits.
>
> * * *
>
> **Our business has strong flow-through to operating income. For the full year, for each incremental $1 of revenue, we expect to generate at least $0.50 of incremental operating income**.
>
> * * *
>
> Based on continued year-over-year recruitment growth and the current retention, we anticipate exiting 2018 with approximately 4 million end-of-period subscribers, up 800,000 or about 25% from where we ended 2017.
>
> **Given the nature of our subscription business model, we anticipate this higher level of subscribers, when entering 2019, would alone translate into an EPS tailwind of approximately $0.50 in 2019.** Note that this $0.50 positive EPS impact is independent of any member recruitment assumptions for 2019, effectively assuming flat recruitment year-over-year, and so it's just a quantification of the starting point to assist with modeling.
>
> **We are making solid progress towards our three-year goal to increase our revenues to more than $2 billion in 2020. We expect about 80% of this revenue growth to be driven by continued positive recruitment and improvements in retention, with opportunities in products, licensing, partnerships, B2B, and new geographies also contributing to the overall growth picture.**

64.     Although the end-of-period subscribers had declined by 100,000 subscribers from the previous quarter, defendants Grossman and Hotchkin reassured investors that the Company remained on track to achieve its end-of-2020 goals, so the stock price only declined by 15%.

65.     On August 7, 2018, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q for the period ended June 30, 2018.  It was signed by defendants Grossman and Hotchkin.

66.     On September 24, 2018, the Individual Defendants caused the Company to announce a rebrand from Weight Watchers to "WW."  Its tagline also changed from "Beyond the Scale" to Wellness that Works" as part of the rebrand from a weight loss company to one focused on general health.  Upon information and belief, the Individual Defendants sought to diversify the Company's customer base, and the rebrand did not employ a program innovation, focusing instead on a new brand identity with new logo, color palette, and photography.

67.     On October 2, 2018, Defendant Hotchkin spoke at the Deutsche Bank Leveraged Financial conference, emphasizing the continued success of the Freestyle program and stating that "retention increase[s]" are "driven by . . . new exciting features in [Weight Watchers'] programs." He also stated that the Company was "very well-poised to meet [its] long-term goals and [its] 2020 targets."

68.     The above statements were misleading because they failed to disclose that: (i) the recruiting lapsed members was necessary to grow the Company's profits and membership; (ii) the Company would focus on attracting new customers, rather than retaining lapsed members; (iii) the Company would not launch a new program innovation in December, deviating from its historical practice; (iv) the Company was unlikely to retain four million subscribers at year-end 2018 as a result of the weak subscriber trends and typical fourth quarter subscription lapses; (v) as a result, the Company was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020; and (vi) due to lower subscriber count, the Company would experience lower revenues and profits.

**The Truth Begins to Emerge**

69.     On November 1, 2018, the Company announced its third quarter 2018 financial results, revealing that end-of-period subscriber count declined 300,000 quarter-over-quarter to 4.2 million.  The Company reported $366 million revenue, and $0.94 earnings per share, well below investors' expectations of $379 million revenue and $0.99 earnings per share.

70.     Defendant Hotchkin attempted to reassure investors, stating that "[h]istorically, approximately 40% of [the Company's] annual member recruitments have occurred during the first quarter," and "[t]herefore, each year first quarter is [its] peak for end of period subscribers and each year end is [its] low point."  However, these statements only emphasized the problem: because average subscriber contracts last nine month, more subscriptions would lapse during fourth quarter 2018 when the Company would sign the fewest number of new subscribers. Therefore, the Company was less likely to retain four million subscribers at the end of fiscal 2018 and even less likely to meet its end-of-2020 goals of five million subscribers to drive revenue exceeding $2 billion.

71.     On this news, the Company's stock price fell $20.36, or nearly 30%, to close at $48.13 per share on November 2, 2018, on unusually heavy trading volume.

72.     As the *New York Post* reported, "[t]he deceleration comes amid intense competition from meal-kit companies like Blue Apron, Hello Fresh, Plated, Whole Foods and growing interest in the high-fat Keto diet."  To overcome the decline in subscribers, the Company expanded its relationships with such companies: Weight Watchers planned to open an online virtual store via Amazon and to develop meal kits with Blue Apron.

73.     Despite the decline in subscribers, the press release on November 1, 2018 still emphasized that the Company experienced "continued strong consumer response" and increased fiscal 2018 earnings guidance to a range of $3.15 to $3.25, from a range of $3.10 to $3.25.

74.     During a conference call to discuss the financial results, defendant Hotchkin stated that the Company continued to experience "strong subscriber trends," that it "continue[d] to make solid progress towards [its] three-year goal to increase [its] revenues to more than $2 billion in 2020," and that it continued to "expect to end 2018 with up to 4 million subscribers, a 12% decline from the Q1 end level, but a 25% increase in level year-over-year."

75.     The above statements in ¶¶ 73-74 were misleading because they failed to disclose that: (i) the recruiting lapsed members was necessary to grow the Company's profits and membership; (ii) the Company would focus on attracting new customers, rather than retaining lapsed members; (iii) the Company would not launch a new program innovation in December, deviating from its historical practice; (iv) the Company was unlikely to retain four million subscribers at year-end 2018 as a result of the weak subscriber trends and typical fourth quarter subscription lapses; (v) as a result, the Company was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020; and (vi) due to lower subscriber count, the Company would experience lower revenues and profits.

**The Truth Fully Emerges**

76.     On February 26, 2019, the Company announced its fourth quarter and full year 2018 financial results.  The Company's subscriber count had declined to 3.9 million and enrollment would continue to decline in fiscal 2019.  Though January is typically the best time for health-focused brands and when 40% of new subscribers typically join, Defendant Grossman revealed that January 2019 had been a "hard month" for the Company.

77.     The Company only expected $1.4 billion revenue for fiscal 2019, below investors' expectations of $1.7 billion revenue and well below the previous projections for $2 billion annual revenue by end-of-2020.  Moreover, the Company only expected $1.25 to $1.50 earnings per share, far below the $3.36 earnings per share investors expected.

78.     During a conference call to discuss the financial results, defendant Grossman attributed the shortfall to the Company's inability to recruit lapsed members, stating that Weight Watchers "campaign did not drive recruitment of our significant universe of lapsed members" and its "winter advertising did not drive consumers, particularly [its] former members to action."

79.     Defendant Hotchkin explained that Defendants had hoped the "newness" in its program would appeal "also to former members who have an affinity for the brand and know that Weight Watchers works." Similarly, defendant Grossman admitted that Freestyle was "geared to both attracting new members as well as lapsed members," noting that the competitive environment "does affect lapsed member recruitment when we're not lapping something new."

80.     During the same call, defendant Grossman acknowledged that "January time period [was] such a critical component of [the Company's] recruitment for the year" and that she "had to be realistic and transparent about what that meant for the balance of the year" when issuing the disappointing fiscal 2019 guidance.

81.     On this news, the Company's share price fell $10.20, or nearly 35%, to close at $19.37 per share on February 27, 2019, on unusually high trading volume.

82.     On February 26, 2019, Amouyal and Elkins resigned as directors.

## CERTAIN OFFICERS AND DIRECTORS PROFITED FROM STOCK SALES WHILE IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION

**Debbane, Fajgenbum, Sobecki, and Amouyal**

83.     Pursuant to a Registration Rights Agreement between the Company, Artal, and Heinz that the parties entered into when Artal acquired Weight Watchers, Artal has the right to require the Company to register its shares for public sale under certain conditions.  While the investing public was unaware of the material non-public information about the negative trends impacting the Company's subscriber growth and retention, Artal sold more than half its interest in

Weight Watchers.  As of March 12, 2018, Artal owned more than 29.4 million shares of Weight Watchers common stock, or 44.47% of its then-outstanding shares.

84.     On May 14, 2018, the Individual Defendants caused the Company to file a final prospectus with the SEC on Form 424b7 ("Prospectus," and with the Form S-3, the "Registration Statement").  The Prospectus stated that Artal would sell 7.5 million shares for $69 per share in a secondary stock offering ("SPO") subject to an underwriters' overallotment option of 1.125 million shares.  During the SPO, Artal sold 8.63 million shares and received approximately $595.5 million in gross periods.

85.     On August 14, 2018, Artal sold six million shares through Morgan Stanley, which had also served as lead underwriter in the May 2018 SPO.  Morgan Stanley sold these shares in individual sales exempt from registration.  Artal received $464.34 million proceeds.

86.     As of March 11, 2019, Artal held nearly 14.82 million shares of Weight Watchers common stock, or 22.13% of its then-outstanding shares.

87.     Debbane, Fajgenbum, Sobecki, and Amouyal are principals of Invus, the exclusive investment advisor to Artal.  Fajgenbum, Sobecki, and Amouyal are three of Invus' six managing directors.  Debbane is co-founder, President, and CEO of Invus, and he is CEO and a director of Artal.  As set forth herein, between February 2018 and February 26, 2019, Debbane, Fajgenbum, Sobecki, and Amouyal possessed material non-public information and directed Artal to sell its stock.  Moreover, Debbane, Fajgenbum, Sobecki, and Amouyal received customary compensation from Artal in connection with these transactions.

88.     Debbane, Fajgenbum, Sobecki, and Amouyal thus used their fiduciary positions to enrich themselves and failed to discharge their fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

**Hotchkin**

89.     Hotchkin is CFO of Weight Watchers with a highly sophisticated understanding of the Company's results and their import.

90.     As set forth herein, between February 2018 and February 26, 2019, Hotchkin possessed material negative information which he knew was being concealed from investors.

91.     On August 30, 2018, Hotchkin sold 131,466 shares of the Company's stock and received more than $9,946,160 million in gross proceeds.  Hotchkin had not sold any of his personally held Weight Watchers shares for at least two years prior to that date.   THe sale constituted roughly 61% of his holdings.

92.     Hotchkin thus used his fiduciary position to enrich himself and failed to discharge his fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

<u>DAMAGES TO THE COMPANY</u>

93.     As a direct and proximate result of the Individual Defendants' conduct, Weight Watchers has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

     a)  Legal fees incurred in connection with the Securities Class Action;

     b)  Any funds paid to settle the Securities Class Action;  and

     c)  Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Weight Watchers.

94.     In addition, Weight Watchers' business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

95.     The actions complained of herein have irreparably damaged Weight Watchers' corporate image and goodwill.  For at least the foreseeable future, Weight Watchers will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Weight Watchers' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND ALLEGATIONS

96.     Plaintiff brings this action derivatively in the right and for the benefit of Weight Watchers to redress injuries suffered, and to be suffered, by Weight Watchers as a direct result of breaches of fiduciary duty by the Individual Defendants, waste of corporate assets, gross mismanagement, violations of Section 10(b) of the Exchange Act, and insider trading.  Weight Watchers is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff will adequately and fairly represent the interests of Weight Watchers in enforcing and prosecuting its rights.

98.     Plaintiff has continuously been a shareholder of Weight Watchers at times relevant to the wrongdoing complained of and is a current Weight Watchers shareholder.

99.     Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by Virginia law.  As detailed below, the Board failed to respond to the demand during the time allotted under Virginia law, which and apparently therefore has not evaluated its merits in good faith based on all information reasonably available to it.  And, as alleged below, the Board did not in fact act independently in its review of the Demand.  The Board's conduct upon receipt of the Demand and thereafter demonstrates not only that the Board did not fully inform itself during its consideration of the Demand, but also that the Board never considered the Demand in good faith, and rejected it for reasons unrelated to the merits of the

claims and Weight Watchers' best interests.  Accordingly, the Board's refusal of the Demand is not a protected exercise of business judgment.

100.    On July 18, 2019, Plaintiff sent the Demand to the Board. The Demand states that Plaintiff has owned shares of Weight Watchers since 2017.  The Demand alleges that, as detailed above, Weight Watchers failed to disclose that: (i) the Company's subscriber growth and retention rates were declining due to competition from smartphone fitness apps and meal delivery services; (ii) the Company was unlikely to retain four million subscribers at year-end 2018 as a result of the weak subscriber trends and typical fourth quarter subscription lapses; (iii) as a result, the Company was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020; and (iv) due to lower subscriber count, the Company would experience lower revenues and profits

101.    The Demand asks the Board to "investigate whether any of Weight Watchers' officers and directors committed non-exculpable breaches of fiduciary duties or other violations of applicable law in connection [with] the allegations herein."  A true and correct copy of the Demand is attached hereto as Exhibit A.

102.    In a letter dated August 7, 2019, inhouse counsel for Weight Watchers stated that "the Board will consider your demand and will provide a further response to your letter when that response is complete."  The letter further requested, without basis, documentation evidencing Plaintiff's Weight Watchers shareholdings.  A true and correct copy of the August 7, 2019 letter is attached hereto as Exhibit B.

103.    Plaintiff, in a good faith effort to ensure the Demand received review by the Board, undertook the lengthy process required to obtain the requested proof of share ownership even though the Company's request was entirely without legal basis.  On August 27, 2019, plaintiff's

counsel sent a letter to counsel for Weight Watchers enclosing the unnecessary additional proof. In this letter, plaintiff's counsel requested information regarding what, if any, steps the Board had taken in response to the Demand.  A true and correct copy of the August 27, 2019 letter is attached hereto as Exhibit C.

104.    Inhouse counsel for Weight Watchers responded that the Board had "created a special litigation committee to investigate and evaluate the claims" in the Demand.  A true and correct copy of the letter dated September 11, 2019 is attached hereto as Exhibit D.

105.    Under Virginia law, the Board was required to respond to the Demand within 90 days of receipt.  The Board did not respond in the allotted time, and Plaintiff therefore has standing under Virginia law to sue derivatively.

106.    A majority of the directors who received the Demand were not independent and disinterested.  Debbane, Fajgenbaum, and Sobecki were nominated to the Board by Artal in 1999 when it acquired its interest in Weight Watchers.  They are principals of Invus, and they have received compensation from Artal in connection with Artal's sales of Weight Watchers stock. Debbane is CEO of Artal, which profited from sale of Weight Watchers stock, while he possessed material non-public information.  Moreover, Artal is a defendant in the Securities Class Action. As a result, Debbane, Fajgenbaum, and Sobecki would be interested in a demand regarding their own wrongdoing.

107.    Additionally, Grossman derives substantially all of her income from her employment with Weight Watchers.  Upon information and belief, Grossman did not want the Company's brand to be associated with middle-aged white women, its core demographic, and she targeted Weight Watchers' Freestyle campaign accordingly; she disregarded feedback from lapsed members and directed employees not to make changes to the Freestyle program based on feedback

from lapsed members.  The decline in subscriber growth, as alleged herein, is substantially due to the failure to recruit lapsed members.  As such, Grossman knowingly issued misleading statements and concealed the material facts described herein.  Due to her statements, she is named as a defendant in the Securities Class Action.  As a result, Grossman would be interested in a demand regarding her own wrongdoing.

108.   Kelly and Altschuler served as members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  Kelly and Altschuler failed to ensure the integrity of the Company's internal controls, allowing the misleading statements to be disseminated in the Company's SEC filings and other disclosures. As a result, Kelly and Altschuler would be interested in a demand regarding their own wrongdoing.

109.   Winfrey owned 11% of the Company's common stock as of March 12, 2018. Through its contractual relationships with Winfrey, Artal, which owned 44.47% of the Company's common stock as of March 12, 2018, exercised effective control over Weight Watchers.  Winfrey cannot disinterestedly and independently consider any demand to sue Debbane, who is the CEO and a director of Artal, because that would jeopardize her contractual agreements with Artal.

110.   Thus, the Board's failure to act in the face of the foregoing conduct is not a valid exercise of business judgment. Accordingly, a majority of the Board were aware or recklessly disregarded that Weight Watchers' representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company's financial condition, and therefore could not have independently considered the Demand.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Weight Watchers' business and affairs, particularly with respect to issues as fundamental as public disclosures.

113.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Weight Watchers.

114.    In breach of their fiduciary duties owed to Weight Watchers, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

115.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Weight Watchers has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company

## COUNT II

### Against the Director Defendants for Waste of Corporate Assets

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The Individual Defendants knowingly, intentionally, recklessly, or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which Weight Watchers has been and continues to be substantially damaged.

119.    In light of their deficient performance in supervising controls and financial affairs of the Company, the Individual Defendants have wasted corporate assets by overly compensating themselves and the Company's executives during times when the Company was materially misstating its performance to the investing public.

120.    Accordingly, the Individual Defendants should be required to make the Company whole for such waste.

## COUNT III

### Against the Director Defendants for Gross Mismanagement

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a  publicly held corporation.

123.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

124.    Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## COUNT IV

### Against the Director Defendants for Violations of Section 10(b)
### of the Exchange Act and SEC Rule 10b-5

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    During the relevant period, Defendants disseminated or approved public statements that failed to disclose the truth about the Company's business and corporate affairs as set forth above, and thus Weight Watchers' public statements were materially false and/or misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

127.    As such, Defendants caused the Company to violate Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

128.    employed devices, schemes, and artifices to defraud; and

129.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT V

### Against Defendants Debbane, Fajgenbaum, Sobecki, Amouyal and Hotchkin – *Brophy* Claim

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    As alleged herein, Debbane, Fajgenbaum, Sobecki, Amouyal, and Hotchkin are fiduciaries of Weight Watchers, possessed material, non-public information of Weight Watchers, and used that information improperly to profit from sales of Weight Watchers stock.  When Debbane, Fajgenbaum, Sobecki, Amouyal, and Hotchkin directed the stock sales set forth above (¶¶ 67-68, 74, *supra*), they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

133.    When Debbane, Fajgenbaum, Sobecki, and Amouyal advised Artal to sell its Weight Watchers stock, and when Hotchkin sold his Weight Watchers stock, they knew that the investing public was unaware of the negative material information that they possessed.  They also knew that if the information were disclosed, the market price of Weight Watchers would be significantly lower.  Debbane, Fajgenbaum, Sobecki, Amouyal, and Hotchkin timed these stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold.  They thereby benefitted by misappropriating Weight Watchers' non-public information.

134.    Plaintiff, on behalf of Weight Watchers, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Weight Watchers, demands judgment as follows:

A.      Declaring that plaintiff may maintain this action on behalf of Weight Watchers and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Weight Watchers;

D.      Directing Weight Watchers to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Weight Watchers and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Weight Watchers' oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Weight Watchers to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Weight Watchers has an effective remedy;

   F. Awarding to Weight Watchers restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

   G. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

   H. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.


Dated: October 25, 2019     By: */s/Benjamin I. Sachs-Michaels*

       **GLANCY PRONGAY & MURRAY LLP**
       Matthew M. Houston
       Benjamin I. Sachs-Michaels
       712 Fifth Avenue
       New York, New York 10019
       Telephone:  (212) 935-7400
       E-mail: bsachsmichaels@glancylaw.com

         -and-

       Robert V. Prongay
       Lesley F. Portnoy
       Pavithra Rajesh
       1925 Century Park East, Suite 2100
       Los Angeles, California 90067
       Telephone:  (310) 201-9150
       E-mail:  rprongay@glancylaw.com

       *Attorneys for Plaintiff Jonathan Ransom*

DocuSign Envelope ID: 72EBEDEE-8DC5-447A-B449-14622DB7A6A0

## VERIFICATION

I, Jonathan Ransom, do hereby verify that I am a holder of common stock of Weight Watchers International, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Shareholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.   All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 10/24/2019

DocuSigned by:

*Jonathan Ransom*

5F8327A7065048F...

Jonathan Ransom